# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| ANTONIO CRESPO-LUGO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 3:09-CV-142-TLS |
| | ) | |
| BRETT SWANSON, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

On December 5, 2008, the Defendant, LaPorte County Sheriff Deputy Brett Swanson, following the directive of a Drug Enforcement Administration special agent, conducted an investigatory stop of Plaintiff Antonio Crespo-Lugo's vehicle. During the stop, the Defendant patted the Plaintiff down for officer safety, obtained the Plaintiff's consent to search his briefcase, used a dog to sniff search around the exterior of the car for drugs, towed the car and searched its interior, and temporarily seized cash that was recovered during the stop. The Plaintiff sued the Defendant, alleging that his actions violated the Plaintiff's Fourth Amendment right to be free from unreasonable search and seizure. The Defendant has moved for summary judgment.

## BACKGROUND

On April 6, 2009, the Plaintiff filed a Complaint alleging that the Defendant violated his Fourth Amendment right to be free from unreasonable searches and seizures and his Fourteenth Amendment due process rights when the Defendant stopped his vehicle and seized him and his property. The Complaint also alleges that the Defendant wrongfully harassed, intimidated, and arrested the Plaintiff. On April 16, the Defendant filed his Answer. On April 23, 2010, the

Defendant filed a Motion for Summary Judgment [ECF No. 22] and Memorandum in Support of Motion for Summary Judgment [ECF No. 23]. After several extensions of time, the Plaintiff, on August 9, filed his Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment [ECF No. 32] and Statement of Genuine Issues of Material Facts [ECF No. 33]. On August 19, the Defendant filed his Reply to Crespo-Lugo's Response [ECF No. 34].

**STANDARD OF REVIEW**

The Federal Rules of Civil Procedure state that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[1] A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50 (1986); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also* N.D. Ind. L.R. 56.1(a) (stating that the movant must provide a "Statement of Material Facts" that identifies the facts that the moving party contends are not genuinely disputed). In response, the nonmoving party cannot rest on bare pleadings alone but must use the

---

[1] A new version of Federal Rule of Civil Procedure 56 went into effect on December 1, 2010. The purpose of the revisions to the Rule was to improve the procedures for presenting and deciding summary judgment motions and to make the procedures more consistent with those already used in many courts. Fed. R. Civ. P. 56, Committee Notes for 2010 Amendments. The amendments are not intended to effect continuing development of the decisional law construing and applying the standard for granting summary judgment, which remains unchanged. *See* Fed. R. Civ. P. 56(a) & Committee Notes for 2010 Amendments.

evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324; *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000); N.D. Ind. L.R. 56.1(b) (directing that a response in opposition to a motion for summary judgment must include "a section labeled 'Statement of Genuine Disputes' that identifies the material facts that the party contends are genuinely disputed so as to make a trial necessary"). According to Rule 56,

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c).

Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, the court must construe all facts in a light most favorable to the nonmoving party, view all reasonable inferences in that party's favor, *see Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true," *Shepherd v. Slater Steels Corp.*, 168 F.3d 998, 1009 (7th Cir. 1999). *See also Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (noting the often stated proposition that "summary judgment cannot be used to resolve swearing contests between litigants"). A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598–99. "Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute." *Harney v. Speedway SuperAmerica, LLC,* 526 F.3d 1099, 1104 (7th Cir. 2008).

**STATEMENT OF FACTS**

A.   **Investigation of 3D Auto Sales**

David Ritchie is a Special Agent for the United States Drug Enforcement Administration (DEA). The DEA assigned Agent Ritchie to investigate drug activity occurring in LaPorte, Indiana. By November 2008, Agent Ritchie's investigation led him to believe that Rosando Delreal was trafficking large quantities of illegal drugs through his used car sales business, 3D Auto Sales, located on Route 2 in LaPorte. Agent Ritchie recruited members of a task force comprised of federal and state law enforcement officers to aid in the investigation, and he obtained a wire tap of the telephones at 3D Auto Sales. The wire tap, which recorded telephone conversations at 3D Auto Sales from November 19 to December 18, confirmed that negotiations and drugs sales, conducted in Spanish, were frequent and ongoing. Through their monitoring of the wire tap, the task force identified code words that were used to describe the types and amounts of drugs being sold. Toward the end of the wiretapping period, the task force started conducting surveillance of 3D Auto Sales's premises.

B.   **The Plaintiff's Visit to 3D Auto Sales**

On Friday, December 5, Agent Ritchie was listening to telephone conversations being conducted at 3D Auto Sales. He was also directing on-site surveillance of the sales lot. Another task force member who was positioned in a vehicle across the street from 3D communicated with Agent Ritchie about activity at the car lot as it occurred, including descriptions of who came to the lot and for how long they stayed. The Defendant, Brett Swanson, is a LaPorte County Sheriff's Deputy who was also as a member of the task force. On December 5, he was standing

by to stop for further investigation any person whom Agent Ritchie believed was engaged in drug activity during his or her visit to 3D Auto Sales. The Plaintiff was one such visitor to 3D Auto Sales. The following events, as observed by members of the task force and relayed to Agent Ritchie, preceded Agent Ritchie's decision to direct the Defendant to stop the Plaintiff's car after it left the 3D Auto Sales lot.

At about 3:00 p.m., the Plaintiff arrived at 3D Auto Sales in a silver Grand Prix. The Plaintiff retrieved a briefcase from the car and went directly inside the office building. The Plaintiff remained inside the office for forty-five minutes. During this forty-five-minute period, Agent Ritchie heard Delreal talking on the telephone, using words that the task force had identified as code words for his drug dealings. The Plaintiff left the office with his briefcase and drove away in the Grand Prix.[2] The Plaintiff's behavior caused Agent Ritchie to suspect that the Plaintiff had not visited 3D Auto Sales looking for a car, but was engaged in illegal drug activity with Delreal.

According to the Plaintiff, he did not engage in drug dealing at 3D Auto Sales on

---

[2] According to Agent Ritchie, surveillance relayed that after forty-five minutes, the Plaintiff and Delreal came out of the office and left together in the Grand Prix. Agent Ritchie directed that a task force member follow the Grand Prix. The Plaintiff drove about a mile to another business, parked near the front door of a building, retrieved his briefcase, entered the building with Delreal, returned to the Grand Prix a short time later, and drove back to 3D Auto Sales. Delreal returned to the office and the Plaintiff drove away. The Plaintiff asserts in his Statement of Genuine Issues of Material Facts that he "does not remember going anywhere that day (12/05/08) with Delreal." (ECF No. 33, ¶¶ 9–12.) The Plaintiff does not include a citation to admissible evidence in support of the statement that he does not remember going anywhere with Delreal. However, the Court has reviewed the Plaintiff's deposition and finds support for the Plaintiff's assertion that he did not drive anywhere with Delreal. (Crespo-Lugo Dep. 42–43, ECF No. 23-2.) The Court concludes that whether the Plaintiff left with Delreal for a short time is an issue of fact. The Defendant argues that the issue is not material because regardless of whether the Plaintiff and Delreal went to a second location, the stop was lawful. Whether this issue of fact, or any others, is outcome determinative and necessary for a jury to decide will be assessed in light of the substantive law. *See Anderson*, 477 U.S. at 248 (holding that only factual disputes that might affect the outcome of the suit in light of the substantive law will preclude summary judgment).

December 5, 2008, and was not even aware of Delreal's illegal activity or that Delreal was being investigated by the DEA. On December 5, he drove from Three Rivers, Michigan, to 3D Auto Sales to buy a vehicle for himself. The vehicle was one that Delreal had already contacted the Plaintiff about buying. When the Plaintiff arrived at 3D Auto Sales, he saw the car Delreal had offered to sell him parked in the lot and he did not need to examine or drive the car to know what price he was willing to pay for it.[3] The Plaintiff went to the office and waited for a long time to meet with Delreal. When Delreal finally met with him and told him the price of the car, the Plaintiff decided that Delreal's asking price was too high and he left 3D Auto Sales without buying a car. The Plaintiff typically keeps a briefcase with him that contains his important personal papers.

**C.      The Traffic Stop**

Pursuant to Agent Ritchie's directive, the Defendant followed the Grand Prix and conducted a traffic stop. During the stop, the Defendant obtained the Plaintiff's driver's license. The Defendant asked the Plaintiff to retrieve the registration, which was tucked behind the temporary dealer plate that was located in the back window of the Grand Prix. When the Plaintiff exited his car, the Defendant patted him down for weapons. The Plaintiff had already admitted to having a small pocket knife. During the pat-down, the Defendant felt a bulge in the Plaintiff's pocket, and removed a large bundle of folded cash. The Defendant and the Plaintiff went to the

---

[3] The Plaintiff believes that he has a unique God-given ability to, upon sight, accurately assess the value of cars and other assets, such as houses. As a hobby, he used this ability to help various car dealers, including Delreal, make purchasing decisions at auto auctions.

6

Defendant's car to count the money, which was mostly $100 bills. It totaled $7,362. The Plaintiff told the Defendant that the money was to buy a car. The Plaintiff also consented to a search of his briefcase, which contained an additional $523. The car was registered to a used car dealer in Howe, Michigan. The Defendant reported to Agent Ritchie that the Plaintiff was from Michigan, that he had over $7,000 in cash and additional money in his briefcase, and that the Plaintiff said he had the cash because he intended to buy a car.

Agent Ritchie thought that the Plaintiff's explanation for having a large sum of cash was inconsistent with his behavior at 3D, where he did not look at any cars. Agent Ritchie decided to employ a drug detecting dog to sniff search the exterior of the car, and called a K-9 officer who lived nearby. The officer's dog alerted to the presence of narcotics on the passenger side of the Grand Prix.[4] The Defendant informed Agent Ritchie of the positive alert. Agent Ritchie told the Defendant to let the Plaintiff leave if he wanted, but to impound the car to search it. The Defendant told the Plaintiff that, due to the dog's positive alert, they were going to impound his vehicle to search it out of the inclement weather. (It was cold, rainy, and dark.) The car was towed to a nearby garage. Because the Plaintiff stated he did not have any means to get home, the Defendant drove the Plaintiff to the garage to wait for the search to be concluded and to get his car back.

---

[4] The testimony from the Defendant, the K-9 officer, and Agent Ritchie is consistent that the dog alerted for the presence of drugs on the passenger side of the car, but it is not consistent concerning whether it alerted to the front passenger side, the rear passenger side, or both. The Plaintiff notes that the dog barked at something across the street, but does not indicate the relevance or importance of the barking. In an affidavit, the K-9 officer averred that the dog typically barked excitedly before beginning a free air sniff, and that once he starts the sniff, his method of alerting to the odor of narcotics is to sit down at the source of the odor. (Samuelson Aff. ¶ 7, ECF No. 23-4.) He stated that the dog followed this same pattern during the free air sniff on December 5, and that he alerted at the passenger side rear door.

There is no genuine issue of fact whether the dog alerted to the presence of narcotics. The only dispute is which area of the passenger side he alerted to.

**D. Search of the Plaintiff's Vehicle**

While he was at the garage, the Plaintiff signed a LaPorte County Police Department Consent to Search form. His signature is printed on a line that is intended for guardians. This line is directly above the signature lines for the two witnesses. The Defendant and a second officer signed the form as witnesses.

During the search, the Defendant found a twenty dollar bill under the dash covered with white residue. Agent Ritchie determined that they should not arrest the Plaintiff and directed the Defendant to return the Grand Prix to the Plaintiff but to retain the cash pending further determination whether it was subject to forfeiture. The Defendant provided the Plaintiff with his contact information and instructed him to call the Defendant to get his money back.

**E. Return of the Plaintiff's Cash**

On the Monday following the traffic stop, the Defendant returned to his office and retrieved phone messages from the Plaintiff requesting that his money be returned. The Defendant called the Plaintiff and told him he could get his money, but the Plaintiff was already on his way to a doctor's appointment in Detroit. Later in the week, an attorney called the Defendant claiming to represent the Plaintiff regarding the return of $8,000. The lawyer hung up when the Defendant informed him the amount was $7,300. A short time later, a second attorney called on behalf of the Plaintiff. The money was not immediately returned because the Plaintiff's counsel did not want the Plaintiff to sign the DEA form receipt for the return of property because it contained a release. This release referred to claims arising out of or related to the return of the property. Eventually, on May 20, 2009, the Plaintiff signed a different receipt that did not

contain any release, and he received his money.

## DISCUSSION

The Plaintiff claims that the Defendant violated his Fourth Amendment rights when he seized the Plaintiff, his automobile, and his property. The Plaintiff argues that the Defendant did not have probable cause to stop his vehicle based upon his meeting with Delreal at 3D Auto Sales. Probable cause, however, is not necessary for police to conduct an investigatory stop that is limited in scope and executed by reasonable means. *Terry v. Ohio*, 392 U.S. 1, 18–20 (1968). Pursuant to *Terry* and its prodigy, police may initiate an investigatory stop when the officer has reasonable suspicion that a crime may be afoot. 392 U.S. at 30; *United States v. Jackson*, 300 F.3d 740, 745 (7th Cir. 2002). To conduct a *Terry* stop, an officer must be "aware of specific and articulable facts giving rise to reasonable suspicion." *United States v. Tilmon*, 19 F.3d 1221, 1224 (7th Cir. 1994). Reasonable suspicion is more than a hunch but less than probable cause and "considerably less than preponderance of the evidence." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). It requires "some minimal level of objective justification for making a stop." *United States v. Sokolow*, 490 U.S. 1, 7 (1989). To determine whether an officer had a reasonable suspicion, a court must consider "the totality of circumstances," and "common-sensical judgments and inference about human behavior." *United States v. Baskin*, 401 F.3d 788, 791 (7th Cir. 2005).

### A. The Investigatory Stop

Agent Ritchie had specific and articulable facts that gave rise to reasonable suspicion that

the Plaintiff did not go to 3D Auto Sales to shop for or buy a car, but instead went to see Delreal about drugs. Based upon evidence obtained during his ongoing investigation, Agent Ritchie believed that Delreal used 3D Auto Sales as a front for drug trafficking. Even if the Plaintiff did not go to a second location with Delreal after being in the office for forty-five minutes, his behavior was not that of a typical consumer. When the Plaintiff arrived at 3D Auto Sales, he did not walk around the lot or examine any cars. He obtained a briefcase from his car and walked directly into the office. Most people who are car shopping will walk around looking at cars before attempting to make any contact with a sales person. If they are interested in a particular car, they will read the information provided on the dealer sticker, look inside the car, check the body, and, if still interested, test drive it. Even if an innocent explanation exists for the Plaintiff's behavior at 3D Auto Sales—as the Plaintiff claims and this Court assumes—his actions could still justify suspicion that he was engaged in criminal activity. *See United States v. Arvizu*, 534 U.S. 266, 277 (2002) ("A determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct"); *Reid v. Georgia*, 448 U.S. 438, 441 (1980) (stating that "there could, of course, be circumstances in which wholly lawful conduct might justify the suspicion that criminal activity was afoot"). The Plaintiff stayed in the office for forty-five minutes before he returned to his car with his briefcase and drove away without having looked at a single car. Agent Ritchie had no way of knowing that the Plaintiff already had one specific car in mind, or that he believed he had a unique ability to summarily assess the value of the car without examining it. Additionally, neither Agent Ritchie nor any other member of the task force had knowledge of the Plaintiff's habits, and thus would not have been aware that he typically carried a briefcase with him. Adding to the suspicion, while the Plaintiff was inside the office, Agent

Ritchie heard Delreal through the wiretap talking on the telephone. He was using words that the task force had identified as code for his drug dealings. It was reasonable for Agent Ritchie to suspect that Delreal would only talk about drug deals in the presence or proximity of persons who were aware of his illegal activity, and that since the Plaintiff was inside the office he was a potentially a party to these dealings.[5]

Based on the totality of circumstances and common-sensical judgments and inferences about human behavior, the specific and articulable facts known to Agent Ritchie gave rise to a particularized and reasonable suspicion that the Plaintiff was involved in illegal drug activity at 3D Auto Sales. Accordingly, Agent Ritchie did not violate the Plaintiff's rights when he ordered the Defendant to stop his vehicle for further investigation. Although the Defendant was not personally aware of the Plaintiff's behavior, the officer who makes a stop need not have such personal knowledge, but may rely upon the conclusion of another officer who is aware of the facts. *See United States v. Hensley*, 469 U.S. 221, 231–33 (1985); *United States v. Sawyer*, 224 F.3d 675, 680 (7th Cir. 2000). The facts known by one officer are imputed to the seizing officer under the collective knowledge doctrine. Agent Ritchie's knowledge can be imputed to the Defendant. The Plaintiff has not presented sufficient evidence from which a reasonable jury could conclude that the initial stop violated the his Fourth Amendment rights.

In his Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, the Plaintiff argues that, because the initial stop was illegal, "all that flowed from it was tainted." (Pl.'s Mem. 6, ECF No. 32.) This statement, and the lack of meaningful analysis

---

[5] Neither party presented evidence to the Court regarding the size or layout of the office, and there is no evidence that Agent Ritchie was aware of the layout on December 5.

concerning the remainder of the stop, suggests that the Plaintiff is hinging his fourth Amendment claim on the lawfulness of the initial stop. Although the Plaintiff recounts the events that occurred after the initial stop—including that the Defendant ordered him out of the car, patted him down, removed and kept a bundle of cash from his pocket, gained consent to look inside the trunk and the Plaintiff's briefcase, called for a drug dog, and towed his car—the only conclusion the Plaintiff provides after recounting these events is that he was stranded with no practical way to get home when the police towed his car, and thus he was seized even if he was not formally arrested.

If the Plaintiff intended to argue that the traffic stop was a seizure, the point is not particularly significant or helpful.[6] First, it is not disputed. *See, e.g.*, *Brendlin v. California*, 551 U.S. 249, 255 (2007) (collecting cases for the settled proposition that, in Fourth Amendment terms, a traffic stop entails a seizure of the car's occupants); *Carmichael v. Village of Palatine, Ill.*, 605 F.3d 451, 456 (7th Cir. 2010) (stating that even the "temporary detention of an individual during the stop of an automobile by the police, even if only for a short period of time and for a limited purpose, constitutes the seizure of a person within the meaning of [the Fourth Amendment]"). Second, to advance a Fourth Amendment claim, the Plaintiff must show that Defendant's actions were unreasonable. *See United States v. Swift*, 220 F.3d 502, 506 (7th Cir. 2000) (noting that the Fourth Amendment protects "against unreasonable searches and seizures" (citing U.S. Const. Amend. IV)); *see also United States v. Oglesby*, 597 F.3d 891, 894 (7th Cir. 2010) ("The Fourth Amendment of the United States Constitution provides certain protections to

---

[6] The Plaintiff's argument that towing his car at the end of the stop resulted in his seizure for which probable cause was required is a separate issue that the Court will address later in this Opinion.

the public from searches and seizures, but it does not bar all searches."). Although a "seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution," *Illinois v. Caballes*, 543 U.S. 405 (2005), the Plaintiff does not argue that the pat down, removal of money from his pocket, or dog sniff search were unlawful or unreasonable.

"A person stopped on reasonable suspicion must be released as soon as the officers have assured themselves that no skullduggery is afoot." *United States v. Childs*, 277 F.3d 947, 952 (7th Cir. 2002). Here, the discovery of the cash, the Plaintiff's explanation that he intended to buy a car at the business of a suspected drug dealer without having looked at any cars, and the positive alert by the drug dog did not assure the Defendant or Agent Ritchie that the Plaintiff was not engaged in illegal drug activity. The Defendant did not violate the Plaintiff's constitutional rights when he took steps throughout the investigatory stop to confirm or dispel his suspicion.[7]

---

[7] The Defendant took proper steps in ordering the Plaintiff out of his car, frisking the Plaintiff, and waiting for the K-9 officer to arrive. An officer may order a vehicle's occupants out of the car during a routine traffic stop. *See Maryland v. Wilson*, 519 U.S. 408, 410 (1997); *United States v. Muriel*, 418 F.3d 720, 726 (7th Cir. 2005). Officers may conduct a pat-down search when they have some articulable suspicion that a suspect is armed or otherwise dangerous, *United States v. Pedroza*, 269 F.3d 821, 827 (7th Cir. 2001), and individuals engaged in drug transactions are presumed to be armed and dangerous, *see United States v. Serna-Barreto*, 842 F.2d 965, 967 (7th Cir. 1988). *See also United States v. Kenerson*, 585 F.3d 389, 392 (7th Cir. 2009) (finding that violent nature of the drug trade was a relevant factor in assessing reasonableness of a frisk for weapons); *United States v. Askew*, 403 F.3d 496, 507 (7th Cir. 2005) (finding that the danger inherent in stopping suspected drug traffickers, for whom guns are known tools of the trade, warranted a highly intrusive *Terry* stop). The frisk, which the Defendant limited to the Plaintiff's outer layer of clothing, was minimally invasive, and the Defendant started the frisk after the Plaintiff advised him that he had a pocket knife. Simply using a drug-sniffing dog during an otherwise lawful traffic stop does not implicate a defendant's legitimate privacy interests. *Caballes*, 543 U.S. at 409. Moreover, the Defendant's continuance of the *Terry* stop to call a drug sniffing dog was justified by the specific and articulable facts giving rise to the reasonable suspicion that the Plaintiff had engaged in an illegal drug transaction discussed above, and by the Plaintiff's possession of a large amount of cash for the stated purpose of buying a car. The use of a drug sniffing dog was an investigative technique carefully tailored to the underlying justification for the stop. *See United States v. Sharpe*, 470 U.S. 675, 686 (1985) (stating that courts must assess whether law enforcement officers diligently pursued their investigation, as well as the amount of time reasonably required to confirm or dispel their suspicions). The stop was not

B.  **Vehicle Tow and Search**

After the drug alerted the officers to the presence of narcotics, Agent Ritchie directed the Defendant to tow the car so it could be searched. The Plaintiff argues that there was no valid consent to detain and search his car because his signature on the consent form was procured by fraud. The Defendant argues that even if an issue of fact exists regarding the Plaintiff's consent, he had probable cause to search the car and he is entitled to qualified immunity against the Plaintiff's claim that he unlawfully seized and searched his vehicle.

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The purpose of the doctrine is "to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009). When confronted with a claim for qualified immunity, a court must address two questions: (1) whether the plaintiff's allegations make out a deprivation of a constitutional right; and (2) whether the right was clearly established. *Id.*; *McAllister v. Price*, 615 F.3d 877, 881 (7th Cir. 2010). The court may address these prongs in whichever order is best suited to the circumstances of the particular case. *Pearson*, 129 S. Ct. at 818; *McAllister*, 615 F.3d at 881. For a right to be clearly established, its "'contours . . . must be sufficiently clear that a reasonable official would understand that what he is doing violates the right. This is not to say that an official action is protected by qualified immunity unless the very action in question has

---

unreasonably prolonged waiting for the arrival of the K-9 officer, who was at his home about three hundred yards from the location of the traffic stop when he was asked to assist in the stop.

previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.'" *McAllister*, 615 F.3d at 884–85 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (citation omitted)). In ascertaining whether a right is clearly established, this Court looks to controlling Supreme Court and Seventh Circuit precedent. *Baird v. Renbarger*, 576 F.3d 340, 345 (7th Cir. 2009).

The Defendant argues that, even if the Plaintiff did not consent to the search of the vehicle, the search was justified by the automobile exception. Under the "automobile exception" to the warrant requirement, a car may be searched without a warrant if there is probable cause to believe that the car contains contraband or evidence. *Carroll v. United States*, 267 U.S. 132, 149 & 153–56 (1925); *United States v. Hines*, 449 F.3d 808, 814 (7th Cir. 2006). Probable cause exists if, under the totality of circumstances, there is a fair probability that the car contains contraband or evidence of illegal activity. *See Illinois v. Gates*, 462 U.S. 213, 238 (1983) (defining probable cause); *United States v. Washburn*, 383 F.3d 638, 642 (7th Cir. 2004). The determination whether suspicious circumstances rise to the level of probable cause is a common-sense judgment, and officers are entitled to draw reasonable inferences based on their training and experience. *United States v. Williams*, — F.3d —, 2010 WL 4157339, at *3 (7th Cir. Oct. 25, 2010) (citing *United States v. Reed*, 443 F.3d 600, 603 (7th Cir. 2006)). "[P]olice may search 'any area of the vehicle in which the evidence might be found' so long as there is probable cause to believe a vehicle contains evidence of criminal activity." *United States v. Clinton*, 591 F.3d 968, 971 (7th Cir. 2010) (quoting *Arizona v. Gant*, 129 S. Ct. 1710, 1721 (2009)).

Although a wad of cash is not, by itself, a suspicious object, a wad of cash in the

possession of a person who just left the premises of a business that is the target of a DEA investigation for drug trafficking is suspicious. The fact that the Plaintiff did not engage in activity consistent with buying a vehicle—his stated purpose for having the cash—and instead remained inside the office while the target of the investigation engaged in drug related telephone conversations adds to the suspicion the Defendant could have formed. Moreover, a positive alert by a trained drug dog gives rise to probable cause to search a vehicle. *Washburn*, 383 F.3d at 643; *see also United States v. Ganser*, 315 F.3d 839, 844 (7th Cir. 2003) ("Once the canine alerted to the letter, reasonable suspicion was elevated to probable cause." (citations omitted)).

In light of pre-existing law, it would not have been apparent to the Defendant that once he had probable cause to search the car without a warrant, that removing it to a garage to conduct the search was a violation of the Plaintiff's rights. There is no separate exigency requirement to the automobile exception, *Maryland v. Dyson*, 527 U.S. 465, 466–67 (1999); *Pennsylvania v. Labron*, 518 U.S. 938 (1996), and case law indicates that the automobile exception applies even after a car has been impounded, *see Florida v. Meyers*, 466 U.S. 380 (1984). *See also California v. Acevedo*, 500 U.S. 565, 570 (1991) ("[I]f the police have probable cause to justify a warrantless seizure of an automobile on a public roadway, they may conduct either an immediate or a delayed search of the vehicle."); *United States v. Rivera*, 825 F.2d 152, 158 (7th Cir. 1987) (holding that when agents did not immediately search a car that they had probable cause to believe contained contraband, but removed it to a DEA garage, the delay did not invalidate the search). A defendant's lack of access to a vehicle does not defeat the exception as long as it is still "inherently mobile." *United States v. Gallman*, 907 F.2d 639, 641 (7th Cir. 1990) (reasoning that even though the defendant was arrested and an agent had his keys, these circumstances only

16

made the car less accessible to the defendant, not less mobile). *See also United States v. Zahursky*, 580 F.3d 515, 523 (7th Cir. 2009) (finding that even though the defendant was placed in custody and his car seized, the automobile exception applied because the car was inherently mobile and he had a lesser expectation of privacy in it); *United States v. Washburn*, 383 F.3d 638, 641 (7th Cir. 2004) (holding that as long as the vehicle "was inherently, even if not immediately, mobile, the application of the automobile exception was still valid based on the diminished expectation of privacy in one's vehicle"). The Plaintiff does not present any case that would have suggested to the Defendant that he could not tow the Plaintiff's vehicle to another location and had to instead search the car while it was parked alongside the highway. The Defendant is entitled to qualified immunity for any claim that the search and seizure of the car was unlawful.

**C.   Seizure of the Plaintiff**

The Plaintiff argues that the Defendant seized him when the Defendant towed his car because he was stranded and had no practical way to get home. "Under the Fourth Amendment, a person has been seized only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Bentz v. City of Kendallville*, 577 F.3d 776, 779 (7th Cir. 2009) (internal quotation marks omitted). Seizure has also been referred to as an intentional governmental termination of freedom of movement. *Bielanski v. County of Kane*, 550 F.3d 632, 637–38 (7th Cir. 2008). Although the Plaintiff argues that he was stranded when his car was towed to the garage, this is different than whether he had the freedom to go any place else. It is undisputed that the Defendant told the Plaintiff he was free

17

to call someone to come get him and could leave if he desired. The Plaintiff decided to go to the garage to wait with his car, and accepted a ride from the Defendant to the garage. The Plaintiff rode in the front seat of the Defendant's car and made a telephone call to his wife on his cellular phone. Even if it was inconvenient for the Defendant as an out-of-state resident to go home, a reasonable person would have known that he was free to go on his way without police interference. *Cf. United States v. Tyler*, 512 F.3d 405, 410 (7th Cir. 2008) (holding that seizure occurred even though officers did not draw their weapons and the encounter took place on a public street when officers told the defendant he was violating the law, took his identification and retained it while they ran a warrants check, and told the defendant he could not leave until the warrants check was completed). Other factors that might suggest that a seizure occurred were likewise absent. The tow truck was not accompanied by the threatening presence of multiple officers, any display of a weapon by the Defendant, any physical touching of the Plaintiff, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. *See United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (identifying factors that might suggest a seizure has occurred in situations where the person does not attempt to leave).

Even if the Defendant seized the Plaintiff in some manner while executing the search of his car, the circumstances of the seizure did not amount to an arrest requiring probable cause. Except for the Plaintiff's argument that events occurring after the initial stop were tainted, the Plaintiff does not address the reasonableness of the seizure. To make out a claim under § 1983 for an unreasonable seizure in violation of the Fourth Amendment, a plaintiff must allege not only that the defendant's conduct constituted a seizure, but also that the seizure was unreasonable. *Bielanski*, 550 F.3d at 637. "The Fourth Amendment's reasonableness requirement

strikes a balance between an individual's interest in being left alone and the public's interest in community safety, crime control, and the safety of law enforcement officers engaged in the work of protecting the public and investigating crime." *United States v. Jennings*, 544 F.3d 815, 819 (7th Cir. 2008). Here, even if the Plaintiff felt compelled to stay with his car while the police searched it, the seizure was not so intrusive as to outweigh the public's interest in crime control. The police did not place the Plaintiff in handcuffs, restrict his movement, or display force. The Plaintiff has not presented sufficient evidence from which a reasonable jury could conclude that the Defendant unlawfully seized him when the police towed and searched his car.

**D.     Return of the Plaintiff's Money**

The Plaintiff argues, without elaboration or citation to authority, that when the Defendant kept his money from December 5 to May 20, 2009, this "seizure and detention was unreasonable and wrongful under the 4th Amendment." (Pl.'s Mem. of Law 7, ECF No. 32.) The Fourth Amendment governs the initial seizure of property. It does not apply to conduct occurring after the initial seizure. *See Lee v. City of Chi.*, 330 F.3d 456, 466 (7th Cir. 2003) (reasoning that an individual's interest in regaining property that was initially seized with probable cause "is not, and never has been, a concern of the Fourth Amendment"). The Defendant is entitled to summary judgment on the Plaintiff's claim that the delay in returning his money was a violation of the Fourth Amendment.

**E.     State Law Claims**

In his Complaint, the Plaintiff alleges that the Defendant "wrongfully seized his person

and property, harassed, intimidated, [and] arrested plaintiff." (Compl. ¶ 24, ECF No. 1.) The Plaintiff's Complaint also invokes the Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367. Although the Plaintiff's Complaint is not separated into counts or causes of action, the Court assumes that the Plaintiff intended to assert state law claims. Because the contours of these claims mirror those of the federal claims and the Defendant has established that he is entitled to judgment as a matter of law on those federal claims, he is also entitled to summary judgment on the Plaintiff's state law claims. In other words, because the Defendant seized the Plaintiff's property pursuant to an investigation based on reasonable suspicion and upon probable cause that contraband would be found in his car, and the Plaintiff was not arrested or unreasonably seized, he is not entitled to present any state law claims arising out of the same conduct to a jury.

## CONCLUSION AND ORDER

For the foregoing reasons, the Defendant's Motion for Summary Judgment [ECF No. 22] is GRANTED and the Clerk is directed to enter judgment in favor of the Defendant and against the Plaintiff.

SO ORDERED on January 10, 2011.

                                                s/ Theresa L. Springmann
                                                THERESA L. SPRINGMANN
                                                UNITED STATES DISTRICT COURT
                                                FORT WAYNE DIVISION